UNITED STATES COURT OF APPEALS
**Filed 4/17/96**                            TENTH CIRCUIT

—————————————

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff-Appellee-Cross-Appellant, ) | |
| ) | |
| v. ) | No. 95-1003 |
| ) | No. 95-1023 |
| DEDRICK SHAWN CALDWELL ) | (D.C. No. 94-CR-210-Z) |
| ) | (D. Colo.) |
| Defendant-Appellant-Cross-Appellee. ) | |

—————————————

ORDER AND JUDGMENT[*]

—————————————

Before PORFILIO, HENRY, and BRISCOE, Circuit Judges.

—————————————

Defendant Dedrick Shawn Caldwell appeals his conviction and sentence for unlawful possession with intent to distribute and distribution of more than five grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 18 U.S.C. § 2. The United States has filed a cross-appeal challenging the district court's calculation of Caldwell's sentence. For reasons stated below, we affirm Caldwell's conviction and remand for resentencing.

I.

On November 3, 1992, undercover Drug Enforcement Administration (DEA) task force officer Brad Maerz and an informant named "Ray Ray" met with Victor Dickerson. Maerz and Ray Ray informed Dickerson that Maerz was interested in purchasing one ounce of crack cocaine. Dickerson responded that he did not have the cocaine, but could

—————————————

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

take them to a place where it could be obtained. Dickerson, Maerz, and Ray Ray traveled in Dickerson's car to a residence at 2237 Lafayette Street, Denver, Colorado. Upon arriving at the residence, Dickerson introduced Maerz and Ray Ray to a woman later identified as Jamie Fusco. Fusco informed the men that she would have to page her source, "Tim." After receiving a return telephone call, Fusco informed Maerz that she needed $1,050, and Maerz gave her the money.

Shortly thereafter, a man identified as Tim arrived at the back door of Fusco's residence. Fusco opened the door and Tim entered the residence and handed her packages of crack cocaine wrapped in plastic. Tim walked into the living room and introduced himself to Maerz. After asking Maerz if he was a cop and if he had a gun or was wearing a wire, Tim began to frisk Maerz. Maerz replied that he was not a cop and was not wearing a gun or a wire. Tim asked Maerz where he was selling the crack and for what price. Maerz replied that he sold crack in "northwest Denver" for "350 or $400 for a quarter ounce." R. 3 at 100. Apparently satisfied with Maerz' responses, Tim backed away and began playing with Fusco's child.

Fusco then entered the room and gave Maerz a package which was later tested and found to contain 28.25 grams of cocaine base. Maerz asked Tim "if this was a full ounce, if he was sure that it was a full ounce and did anybody have any scales." R. 3 at 102. Tim asked Maerz why he was questioning him, because he didn't "sell dope." Id. Maerz, Ray Ray, and Dickerson left Fusco's residence. Fusco gave Tim the money she had received from Maerz, and Tim gave Fusco $30 to $40.

Fusco and Dickerson were arrested at a later date, pled guilty to the offense of November 3, 1992, and were sentenced to prison. In return for reductions in their

2

sentences, both Fusco and Dickerson cooperated with the government. On five or six separate occasions between November 3, 1992, and July 1994, Special Agent John Hick showed photographs to Maerz in an attempt to identify the man named Tim, but Maerz was unable to identify any of the persons in the photographs. No records were maintained by Hick or Maerz of these identification efforts.

In July 1994, Fusco contacted Hick and gave him information regarding the individual she knew as Tim. In particular, Fusco told Hick that Tim had been arrested recently by Arapahoe County authorities for assault of an acquaintance of hers. Hick discovered the acquaintance had filed a complaint against a man named Dedrick Shawn Caldwell. Hick obtained photographs of Caldwell from the Arapahoe County Sheriff's Department and the Denver Police Department. On July 20, 1994, Hick showed the photographs of Caldwell to Maerz, explained how he obtained the photographs, and asked Maerz, "[I]s this Tim?" Maerz identified the person in the photographs as Tim.

On July 21, 1994, Caldwell was indicted by a federal grand jury, and on July 28, 1994, Hick and Maerz participated in Caldwell's arrest. Following the arrest, Hick advised Caldwell of his Miranda rights. Caldwell stated "he understood those rights and . . . would be willing to answer some questions," but would "not be willing to answer other questions." R. 4 at 237. When asked by Hick if he had any sources in St. Louis, Caldwell said he did not know anyone in St. Louis. When asked by Hick if he had sources in Los Angeles, Caldwell declined to answer. Maerz asked Caldwell if he remembered him, to which Caldwell initially responded "no". Maerz then said: "Sure you do. Remember over on Lafayette Street?" R. 3 at 104-05. Caldwell responded "Oh, yeah," and began talking about Fusco and the sentence she received. In particular,

3

Caldwell stated Fusco "got a raw deal out of that." R. 3 at 105. Maerz asked Caldwell how he got to Fusco's residence because the surveillance officers outside the residence did not see him. Caldwell stated he took a cab to the house. Caldwell further stated that Maerz must have thought he was "a big-time dope dealer" because of the way he was dressed that day. R. 3 at 105.

Caldwell subsequently filed a number of pretrial motions, including a motion to suppress his post-arrest statements and a motion to suppress Maerz' pretrial identification of him. After hearing testimony from Maerz and Hick, the district court denied both motions. The government then filed an information pursuant to 21 U.S.C. § 851, alleging that Caldwell had a prior drug felony conviction that would enhance the statutory sentence. In particular, the information indicated that "[o]n or about February 20, 1986, . . . in the Superior Court in the County of Los Angeles, the Defendant was convicted by way of his plea of guilty, of a violation of California Health and Safety Code § 11352, sale of a controlled substance (cocaine), a felony pursuant to California Penal Code § 17." R. 1, doc. 33.

Caldwell's criminal jury trial began on October 24, 1994. During trial, Fusco, Dickerson, and Maerz testified and identified Caldwell as the individual they knew as Tim who was present at Fusco's residence on November 3, 1992. R. 3 at 102, 107; R. 4 at 168-69, 203-04. Evidence was completed on October 25, 1994, and the jury was instructed and began its deliberations that same day. At approximately 4 p.m. on October 26, 1994, the jury sent a note to the district court stating: "We request information from [the courtroom deputy clerk] or [the trial judge] on hung jury." R. 5 at 270. After conferring with counsel, the district court brought the jury into the courtroom, and

4

instructed them as follows:

> The Court has been notified that the jury wants an instruction on hung juries. The Court wishes you to continue your deliberations, keeping in mind the following:
> (1) as jurors, you have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done.
> (2) Each of you must decide for yourself but only after an impartial consideration with your fellow jurors;
> (3) In the course of deliberation, you should not hesitate to reexamine your own views and change your opinion if convinced it is erroneous, and
> (4) None of you should surrender your honest conviction as to the weight or effect of the evidence solely because of the opinions of your fellow jurors or for the sole purpose of returning a verdict.

R. 5 at 274. In addition, the district court made the following comments to the jury:

> I would like to add one other thought myself from experience in the past, and that is when you go back to the jury room to continue your deliberations, could you just go around the circle, let every juror have his or her say briefly without any interruption from anyone else. And after you've gone around and everyone has had a short say without interruption, then continue your deliberations.

R. 5 at 274-75.

On October 27, 1994, at approximately 2:55 p.m., the jury returned a guilty verdict against defendant Caldwell. On December 19, 1994, Caldwell was sentenced to a term of 260 months. During sentencing, the district court rejected Caldwell's request for a downward departure from career offender status, as well as the government's request to sentence Caldwell within a range of 360 months to life.

## II.

On appeal, Caldwell contends the district court erred (1) in denying his motion to suppress Maerz' pretrial and in-court identifications of him; (2) in denying his motion to suppress post-arrest statements made to Hick and Maerz; (3) in charging the jury with a modified Allen instruction and then adding its own suggestions about the appropriate method of resuming deliberations; and (4) in refusing to grant his motion for a downward

5

departure from career offender status.  We address these contentions in order.

A.  Maerz' identification of Caldwell.

Caldwell argues the pretrial identification procedures used by Hick, i.e., showing Maerz only photographs of Caldwell while simultaneously asking him, "[I]s this Tim," were unduly suggestive and unreliable, and that Maerz' out-of-court and in-court identifications should not have been admitted into evidence at trial.  Because the constitutionality of identification procedures is a mixed question of law and fact, Sumner v. Mata, 455 U.S. 591, 597 (1982), we review de novo the ultimate issue of the constitutionality of identification procedures, while we review for clear error the underlying factual basis for the district court's decision.  United States v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995).

In examining the constitutionality of a pretrial identification procedure, we engage in a two-step analysis.  Grubbs v. Hannigan, 982 F.2d 1483, 1489 (10th Cir. 1993).  First, we determine whether the procedure was unnecessarily suggestive.  Id.  If we determine that the procedure was unnecessarily suggestive, we must then decide whether the identification was reliable under the totality of the circumstances.  Id. at 1489-90.  The Supreme Court has identified five factors to be considered in determining the reliability of a pretrial identification: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of his or her prior description of the criminal; (4) the level of certainty demonstrated by the witness at the identification; and (5) the length of time between the crime and the identification.  Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

6

Assuming, without deciding, that the pretrial identification procedures used by Hick were unnecessarily suggestive, we conclude that Maerz' identification of Caldwell was still reliable. First, as noted by the district court, Maerz was an experienced police officer who, during the course of the November 3, 1992, drug deal, had "close face-to-face contact and conversation with the person" named Tim for approximately three to five minutes. R. 2 at 51. Moreover, although not specifically stated in the record, it is apparent that Maerz "was a trained police officer who realized that later he would have to find and arrest the person with whom he was dealing." Manson v. Brathwaite, 432 U.S. 98, 108 (1977). Accordingly, "he could be expected to pay scrupulous attention to detail." Id. at 115. Second, Maerz' prior description of Tim, i.e., "a young light-skinned man of color whose hair on top was somewhat thin," was somewhat generic, but nevertheless accurate. R. 2 at 51. Third, the district court concluded Maerz was "confident and certain about his identification," R. 2 at 52, and we find nothing clearly erroneous about this factual determination. Moreover, we note that "[t]here is no dispute that the photograph[s] in question [were] of [defendant]." Brathwaite, 432 U.S. at 115. Finally, although approximately twenty months had passed between the time of the crime and the identification, this alone does not render Maerz' identification unreliable. Because Maerz' pretrial identification was reliable in view of the totality of the circumstances and outweighed any corruptive influence created by the pretrial identification procedures, we conclude admission of this evidence at trial did not infringe upon Caldwell's constitutional rights.

In light of our conclusions concerning the reliability of Maerz' pretrial identification, and because Caldwell has not asserted a separate basis for challenging

Maerz' in-court identification, we conclude there was no error on the part of the district court in allowing Maerz to identify Caldwell during trial.

B. Caldwell's post-arrest statements to Hick and Maerz.

Caldwell next contends the district court erred in denying his motion to suppress post-arrest statements he made to Hick and Maerz.  Caldwell argues the statements were unconstitutionally obtained because they were made in response to questions asked by the officers after he had invoked his <u>Miranda</u> rights.  According to Caldwell, the officers should have ended the interrogation after he advised them that he did not want to talk.

The district court denied Caldwell's motion to suppress after hearing testimony from Maerz.  Based upon this testimony, the district court concluded as follows:

> The Court will also deny the motion to suppress the statements.  The testimony at this point is credible that Mr. Maerz heard the <u>Miranda</u> warnings being given to defendant.  Defendant actually decided not to discuss one area with the law enforcement officials, didn't want to talk about Los Angeles.  They didn't pursue it.  But the conversation about whether Mr. Caldwell remembered Mr. Maerz from the Lafayette [Street] incident [on November 3, 1992] was answered, and the Court finds no reason to suppress that, since full warnings were given.

R. 2 at 52.

When reviewing the denial of a motion to suppress evidence, we accept the district court's findings of fact unless clearly erroneous, but review de novo the district court's legal conclusions.  <u>United States v. Baez-Acuna</u>, 54 F.3d 634, 636 (10th Cir. 1995).

Upon arrest, a defendant must be advised of his rights before law enforcement officers begin interrogation.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 467-74 (1966).  If a defendant submits to questioning after receiving <u>Miranda</u> warnings, the government has the burden to establish that the defendant voluntarily, knowingly, and intelligently waived

8

his right to remain silent.  Colorado v. Connelly, 479 U.S. 157, 168 (1986); Moran v. Burbine, 475 U.S. 412, 421 (1986).  Waiver must be established by a preponderance of the evidence.  Connelly, 479 U.S. at 168-69.

We find no basis for disturbing the district court's factual findings or legal conclusions.  Our review of the record reveals a sufficient basis for the district court to conclude that Caldwell was properly advised of his Miranda rights.  Likewise, there is a sufficient basis in the record for concluding that, after receiving the Miranda warning from Hick, Caldwell voluntarily, knowingly, and intelligently decided to waive his rights and talk to Hick and Maerz.  We conclude the district court did not err in denying Caldwell's motion to suppress.

C.  The district court's instructions to the jury.

Caldwell asserts the district court erred when, after receiving a note from the jury requesting information on a hung jury, it gave a modified Allen instruction to the jury. See Allen v. United States, 164 U.S. 492 (1896).  More specifically, Caldwell asserts the court's instructions and comments to the jury had "an impermissibly coercive effect." Appellant's br. at 26.

The purpose of an Allen instruction is to encourage a unanimous verdict.  United States v. Smith, 857 F.2d 682, 683 (10th Cir.1988).  We have traditionally urged caution in the use of the Allen instruction.  United States v. Butler, 904 F.2d 1482, 1488 (10th Cir.1990).  "The preferred rule of procedure is to give an Allen instruction at the same time as other instructions; however, this is not a per se rule."  United States  v. Rodriguez-Mejia, 20 F.3d 1090, 1091 (10th Cir.), cert. denied, 115 S.Ct. 640 (1994).  We

9

review whether an <u>Allen</u> instruction was erroneously given on a case-by-case basis with a view toward determining whether the instruction had a coercive effect on the jury. <u>Id.</u> Factors to be considered in determining whether an <u>Allen</u> charge is coercive include "(1) [t]he language of the instruction; (2) its incorporation with other instructions; and (3) the timing of the instruction." <u>United States v. Porter</u>, 881 F.2d 878, 888 (10th Cir.), <u>cert. denied</u>, 493 U.S. 944 (1989).

We conclude the modified <u>Allen</u> instruction given by the district court and the court's accompanying comment to the jury were neutral and were no more prejudicial to Caldwell than to the government. The instruction and the comment were given only after the jury specifically requested information "on hung jury." Further, neither the instruction nor the comment was prejudicial or coercive on its face. In fact, the modified <u>Allen</u> instruction made clear that no juror was expected to yield any conscientious conviction as to the evidence.

D. Downward departure from career offender status.

Caldwell contends the district court should have granted his motion for a downward departure from his original classification as a career offender. Caldwell asserts two alleged grounds for departure: (1) placing him in the career offender category results in an over-representation of his criminal history score under U.S.S.G. § 4A1.3; and (2) a downward departure was warranted under U.S.S.G. § 5K2.0 because the Sentencing Commission did not adequately consider the disproportionate treatment of drug offenders sentenced to the same penalty range for offenses involving drug quantities of exceptionally different magnitudes.

Section 4A1.3 of the Sentencing Guidelines authorizes a downward departure from the guideline range if a defendant's criminal history is overstated. See United States v. Maldonado-Campos, 920 F.2d 714, 719-20 (10th Cir.1990). Section 5K2.0 of the Sentencing Guidelines allows a downward departure if the court finds there exists an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and that should result in a sentence different from that described."

Here, the district court recognized its discretionary authority to depart downward from the guideline range, but found no basis for doing so. R. 7 at 307. Under these circumstances, we have no jurisdiction to review the court's discretionary refusal to depart downward. United States v. Lloyd, 13 F.3d 1450, 1454 (10th Cir.1994); United States v. Diggs, 8 F.3d 1520, 1526 (10th Cir.1993); United States v. Mendoza-Lopez, 7 F.3d 1483, 1486 (10th Cir.1993), cert. denied, 114 S.Ct. 1552 (1994).

### III.

In its cross-appeal, the government argues the district court erred, at the time of sentencing, in relying upon Application Note 2 to U.S.S.G. § 4B1.1 (career offender), as amended by the Sentencing Commission on November 1, 1994 (amendment 506). According to the government, the Commission violated its statutory authority to assure sentences for career offenders that are "at or near the maximum term authorized," 28 U.S.C. § 994(h), by amending Application Note 2 to require sentencing courts to rely upon unenhanced statutory maximum penalties rather than enhanced statutory maximum penalties in calculating career offender offense levels. Thus, the government argues, amended Application Note 2 is invalid and should not be applied in sentencing a career

offender such as Caldwell.

Before directly addressing the government's arguments, it is necessary to briefly review the relevant procedural aspects of this case. Prior to trial, the government filed a notice under 21 U.S.C. § 851(a)(1) signaling its intention to seek enhanced penalties due to Caldwell's prior state drug conviction. The effect of this notice was to raise the statutory maximum penalty for the charged offense from 40 years to life imprisonment. See 21 U.S.C. § 841(b)(1)(B). At the time of sentencing, the government urged the district court to use the enhanced maximum statutory penalty, i.e., life imprisonment, in determining defendant's career offender offense level under U.S.S.G. § 4B1.1. The district court, however, relied upon the unenhanced maximum statutory penalty, i.e., 40 years, as directed by amended Application Note 2 to § 4B1.1. Accordingly, the district court determined Caldwell's career offender offense level to be 34 rather than 37 as argued by the government. The accompanying guideline range under the offense level calculated by the district court was 262 to 327 months. Under the government's proposed calculations, the accompanying guideline range would have been 360 months to life imprisonment.

In United States v. Novey, ___ F.3d ___, 1996 WL 115326 (10th Cir. 1996), we addressed the validity of the Sentencing Commission's November 1, 1994, amendments to Application Note 2. In Novey, we concluded the amendments were inconsistent with the clear directive of 28 U.S.C. § 994(h), and were "therefore invalid as beyond the scope of the Commission's authority delegated to it by Congress." Id. at ___; 1996 WL 115326 *3.

Consistent with Novey, we agree with the government in this case that the district

12

court erred in relying upon the amendments to Application Note 2 to determine Caldwell's career offender offense level. Accordingly, we conclude it is necessary to remand this case to the district court for resentencing.

IV.

Caldwell's convictions are AFFIRMED and this case is REMANDED for resentencing consistent with this court's recent ruling in <u>Novey</u>.

Entered for the Court

Mary Beck Briscoe
Circuit Judge