FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 1, 2024**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DAVID ANTHONY ROMANNOSE,

    Defendant - Appellant.

No. 22-5049
(D.C. No. 4:21-CR-00332-JFH-1)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **TYMKOVICH**, **EBEL**, and **EID**, Circuit Judges.
_____

David Anthony RomanNose sexually assaulted M.P., a minor, in the back seat

of her father's truck while they drove through eastern Oklahoma. A jury convicted

RomanNose of aggravated sexual abuse of a minor and sexual abuse of a minor. The

district court then sentenced RomanNose to life in prison for aggravated sexual abuse

of a minor to run concurrently with his 180-month sentence for sexual abuse of a

minor.

RomanNose now appeals his conviction for aggravated sexual abuse of a

minor, arguing the evidence presented at trial was insufficient for a jury to find he

---

* This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

used force to sexually assault M.P.  We disagree.  The government presented ample evidence of the disparity in size and coercive power between RomanNose and M.P. as well as RomanNose's use of physical restraint.  Taken together, this evidence was sufficient for a reasonable jury to find RomanNose used force to perpetrate the assault.  Because we affirm the aggravated sexual abuse of a minor conviction, we remand for the district court to vacate his sentence either for that conviction or for the conviction for sexual abuse of a minor, as sentencing RomanNose for both counts violated his rights under the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.  Finally, if the district court does not vacate the sentence for aggravated sexual abuse of a minor, it must resentence RomanNose because it plainly erred by applying U.S.S.G. § 2A3.1(b)(4)(B) without a finding that M.P. sustained a serious bodily injury other than the sexual assault.

## I.

### a.[1]

When M.P. was twelve years old, she moved from North Carolina to New York to spend the summer with her father.  M.P. and her father are enrolled members of the Oneida Indian Nation.  M.P.'s father lived with his then-wife, Renee Roman Nose,[2] who is an enrolled member of the Cheyenne and Arapaho Tribes of Oklahoma.  While M.P. was living with her father, Renee's forty-year-old nephew,

---

[1] The following facts were testified to at the trial.  Neither party disputes them.

[2] David Anthony RomanNose spells his last name as one word.  Renee Roman Nose spells her last name as two words.  To avoid confusion, we refer to Renee Roman Nose by her first name.

David Anthony RomanNose, came to stay with them. Like Renee, RomanNose is an enrolled member of the Cheyenne and Arapaho Tribes of Oklahoma. He was also a friend of M.P.'s father.

M.P. spent a great deal of time with RomanNose that summer. At trial, she testified that the two would "roughhouse [and] tease each other. . . . I would punch him[,] and he would poke my side." R. Vol. III at 82. RomanNose made comments about M.P.'s body, her breasts in particular. "He'd just be, like, 'Well, they're so small, they would barely fit in one cup of a training bra in clothes.'" *Id.* At the time, M.P. thought his behavior was just "kid stuff" even though RomanNose was forty years old. *Id.* She testified, "I thought he was my friend. He was easier to talk to[,] and he would listen to me unlike a lot of people. He just made me feel relevant." *Id.* at 86.

In late June, M.P., her father, Renee, and RomanNose traveled to Seiling, Oklahoma, to attend Renee's Sun Dance ceremony. They drove from New York to Seiling in M.P.'s father's Ford truck. The drive took approximately twenty-four hours. The Sun Dance ceremony lasted four or five days, and the family drove back to New York.

They made a few stops on the return trip. First, they visited one of Renee's family members in Oklahoma. During the visit, M.P. ate a lollipop her father had given her. RomanNose approached her and said, "I bet you can't fit all that in your mouth." *Id.* at 87. M.P. could and showed him so. Then she "took it out and he

3

just—he was, like, 'Oh, wow.'  And I just—it made me feel weird, so I went and got my dad and asked if we could head out . . . ." *Id.*

It was starting to get dark when they left the house.  M.P.'s father and Renee sat in the front seat of the truck, alternating driving and sleeping.[3]  M.P. and RomanNose sat in the back seat.  The two talked and roughhoused until Renee yelled at them to stop so M.P.'s father could sleep.

The sky was pitch black by the time they arrived in eastern Oklahoma.  M.P. testified about what happened next:

> I got really tired so I grabbed my pillow and laid down like how I would normally do on a car ride.  My head wasn't on [RomanNose's] lap[,] but it was touching the side of his lap like on his leg.  And I had my dad's phone[,] and I was listening to music with my earbuds in, and [RomanNose] kept trying to take the phone from me, which I wanted to listen to music[,] and I didn't want to be bothered so, like, I kept stuffing the phone further and further under me.  And I stopped for a second, then he started tracing my face, like touching it, and he moved his hand down to my mouth and traced over my lips a little bit, and then he stuck his hand down my shirt and touched my boobs or whatever—however you want to word that, but then he pulled his hand out and he stuck his fingers in my mouth and then touched my boobs again, but I rolled over and pretended like I was still sleeping.  I turned my music down and I thought I heard his pants unzip[,] but I wasn't sure.  And he grabbed my hand and put it on his penis. . . .

*Id.* at 90–91.  While holding M.P.'s hand on his penis, RomanNose started "moving his hips up and down like—he wasn't moving my hand, he was moving himself." *Id.*

---

[3] There is conflicting testimony as to who was driving at various times.  But because this dispute is irrelevant to the substance of RomanNose's appeal, we take M.P.'s version of events and assume Renee was driving at this point.

at 92.  M.P. "jerked [her hand] away" and "laid there for a second[,] and then I sat up and tossed the pillow at him, told him that he needed to sleep." *Id.*

After that, RomanNose laid down with his head next to M.P.'s leg.  He started rubbing her leg around her knee.

> He would get higher and I'd push his hand, but the more I pushed his hand down, the higher up he would rub, and then he stuck his hand up my shorts and, like, touched me down there, but at first it was just over my underwear, and then he pulled his hand out of my shorts and started rubbing my thigh again, and then he went back in my shorts, but that time it was under my underwear.  [Then,] [h]e stuck his fingers in [my vagina].  He pulled them out a few times and licked his fingers and stuck them back in again.

*Id.* at 93.  This happened two or three times.  M.P. testified that "it hurt really bad." *Id.* at 94.  While RomanNose was assaulting her, M.P. tried to kick the back of her father's seat, "thinking that if I could kick my dad's seat hard enough, he'd turn around to yell at me to stop kicking his seat and it would make [RomanNose] stop." *Id.*  She did not call out or say anything, and eventually she "[j]ust kinda froze." *Id.* The assault ended after approximately forty minutes, when the family arrived at a rest stop.

Bonnie Brunette, a child adolescent forensic interviewer with the Federal Bureau of Investigation, also testified for the government.  Brunette had not personally interviewed M.P.; she testified as an expert in the ways children react to sexual violence.  She testified, "Every child is different so I can't say there's a typical way that kids react to being sexually abused." *Id.* at 240.  She explained that a child's reaction is informed by her age, support level, past trauma, and her

5

relationship with the abuser as well as her perceptions about that person. And she testified that some children do not tell a trusted adult when they are being abused because they think they or the abuser will get into trouble.

RomanNose also testified. He told the jury M.P. had made up the entire incident and he had never sexually assaulted her. His testimony, therefore, did not specifically contradict any of M.P.'s testimony about the details of the assault.

At the close of the trial, the jury convicted RomanNose of one count of aggravated sexual abuse of a minor under 18 U.S.C. § 2241(c) and one count of sexual abuse of a minor under 18 U.S.C. § 2243(a).

**b.**

The Probation Office prepared a pre-sentencing report ("PSR"). The PSR provided an offense level of 44 for the aggravated sexual abuse of a minor conviction. The offense level included an enhancement under U.S.S.G. § 2A3.1(b)(4)(B) because RomanNose had caused serious bodily injury to M.P. by assaulting her. Elsewhere, the guidelines provide that a "serious bodily injury" is "deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241 or § 2242 or any similar offense under state law." U.S.S.G. § 1B1.1 comment (n)(1)(M). RomanNose objected to the enhancement because U.S.S.G. § 2A3.1(b)(4)(B) states that, "for purposes of this guideline, 'serious bodily injury' means conduct other than criminal sexual abuse, which already is taken into account in the base offense level under subsection (a)." U.S.S.G. § 2A3.1(b)(4)(B) app. note 1. The district court overruled his objection and

applied the enhancement.  The PSR also provided an offense level of 22 for the sexual abuse of a minor conviction.  Combined with his criminal history score of eight and the statutory sentencing requirements, RomanNose's guideline range became life for the aggravated sexual abuse of a minor conviction and fifteen years for the sexual abuse of a minor conviction.  The district court sentenced RomanNose to life for aggravated sexual abuse of a minor, which ran concurrent with his 180-month sentence for sexual abuse of a minor.

RomanNose appealed.

## II.

### a.

RomanNose first argues the government presented insufficient evidence for a jury to find an essential element of the aggravated sexual abuse of a minor offense—the use of force.  We disagree.  The government presented ample evidence of the disparity in size and coercive power between RomanNose and M.P. as well as RomanNose's use of physical restraint.  Taken together, this evidence was sufficient for a reasonable jury to find RomanNose used force to perpetrate the assault.

We review de novo whether the government presented sufficient evidence to support a conviction.  *United States v. Dunmire*, 403 F.3d 722, 724 (10th Cir. 2005).  In doing so, "we view the facts in evidence in the light most favorable to the government."  *United States v. Flechs*, 98 F.4th 1235, 1247 (10th Cir. 2024) (quotation omitted).  This standard requires us to "accept the jury's resolution of the

evidence as long as it is within the bounds of reason." *Grubbs v. Hannigan*, 982 F.2d 1483, 1487 (10th Cir. 1993).

We evaluate sufficiency of the evidence not "in bits and pieces," but "by considering the collective inferences to be drawn from the evidence as a whole." *Flechs*, 98 F.4th at 1247 (quotation omitted). This means that "[t]he verdict of a jury must be sustained if . . . there is substantial evidence to support it." *Corbin v. United States*, 253 F.2d 646, 648 (10th Cir. 1958) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)). And while the evidence supporting the conviction must "do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Scull*, 321 F.3d 1270, 1282 (10th Cir. 2003).

In the territorial jurisdiction of the United States, any person who "knowingly engages in a sexual act" with another "person who has attained the age of 12 years but has not attained the age of 16 years" may be convicted of aggravated sexual abuse if he "knowingly causes another person to engage in a sexual act" by "using force against that other person." 18 U.S.C. § 2241(a)(1), (c). This Circuit defines "force" as that which is "sufficient to overcome, restrain or injure a person . . . when the sexual contact resulted from a restraint upon the other person that was sufficient that the other person could not escape the sexual contact." *United States v. Reyes Pena*, 216 F.3d 1204, 1211 (10th Cir. 2000) (internal citations and quotations omitted). Though "force" must be physical, it encompasses a wide range of conduct that extends beyond violence or brute force. *See United States v. Wells*, 38 F.4th

8

1246, 1258 (10th Cir. 2022); *United States v. Platero*, 996 F.3d 1060, 1061 (10th Cir. 2021). For example, in the context of sexual abuse, conduct may constitute force even if it does not physically overcome the victim. *United States v. Willie*, 253 F.3d 1215, 1218 (10th Cir. 2001). Instead, conduct becomes forceful when it "overbear[s] the will of another in perpetrating aggravated sexual abuse." *Id.* (quoting *Reyes Pena*, 216 F.3d at 1210).

> Following these rules, the district court instructed the jury:

> To establish force, the Government need not demonstrate that the Defendant used actual violence. The requirement of force may be satisfied by a showing of restraint sufficient to prevent M.P. from escaping the sexual conduct. Force may also be implied from a disparity in coercive power or in size between the Defendant and M.P. or from a disparity in coercive power combined with physical restraint.

R. Vol. I at 57–58. RomanNose does not contend that the instruction was incorrect. Rather, he argues that the facts presented at trial did not meet this standard. *See* Aplt. Br. at 9. We disagree. The government presented evidence that (1) there was a significant disparity in size and coercive power between RomanNose and M.P., (2) RomanNose physically restrained M.P. during the assault, and (3) RomanNose's physical restraint rendered M.P. unable to escape. Based on this evidence, a reasonable jury could have concluded that RomanNose used force to perpetrate the assault.

First, there was an obvious disparity in size and coercive power between RomanNose and M.P. At the time of the assault, RomanNose was twenty-eight years older than M.P., stood six-foot one-inch tall, and weighed around 225 pounds.

Though M.P. was "a healthy-sized girl," she was only twelve years old and no physical match for RomanNose. R. Vol. III at 167. Further, because the two had engaged in play-fighting over the summer, M.P. was undoubtedly aware that she and RomanNose were not physical equals. Beyond the disparity in age and size, there was a disparity in coercive power. RomanNose was a friend of M.P.'s father and a military veteran who liked to show off his scars from his Army service. And though RomanNose was M.P.'s "friend" for the summer, he was by no metric her peer. Under the district court's proper instructions, these facts support the jury's conclusion that RomanNose used force to perpetrate the assault.

Second, RomanNose physically restrained M.P. during the assault. RomanNose had already demonstrated his physical strength against M.P. when he roughhoused with her in the back seat prior to the abuse. Further, M.P. was confined to the back seat of the car for the duration of the assault, making it possible for RomanNose to physically restrain her with less effort. And though M.P.'s father and stepmother were in the front seats, there was no way for M.P. to escape the assault unless she wanted to yell out—a situation of which RomanNose took full advantage.[4] RomanNose began tracing M.P.'s face with his hand, groping her breasts, and putting his fingers in her mouth. M.P. rolled over and pretended to be asleep to escape the assault, but RomanNose persisted. RomanNose "grabbed" M.P.'s hand and put it on

_____

[4] Brunette testified on direct examination that children "very rare[ly]" disclose sexual abuse immediately because they may struggle to comprehend what is occurring, blame themselves, worry about getting in trouble, or worry about getting their abuser in trouble. R. Vol. III at 241–42.

his penis, "holding [her hand] on it" while he thrust his hips, before she "jerked [her] hand away." R. Vol. III at 91.

At this point, a reasonable jury could already infer that RomanNose was not only engaging in unwanted touching. Indeed, he was restraining M.P.'s arm and hand and engaging in a sexual act through the exertion of force. But RomanNose went further, escalating his use of force. When M.P. tried to create space between her body and RomanNose's, RomanNose closed the gap, cornering her. And when M.P. threw a pillow at RomanNose to stop his advances, RomanNose was not dissuaded. He laid down and began rubbing M.P.'s leg, at first around the knee. M.P. again physically resisted, but her efforts were unsuccessful. As M.P. explained, "He would get higher and I'd push his hand, but the more I pushed his hand down, the higher up he would rub." *Id.* at 93. RomanNose persisted, ultimately digitally penetrating her vagina.

M.P. tried to kick the seat in front of her to get her father's attention, but "kind of froze" and was unable to seek help from the adults in the front seats. *Id.* at 94. RomanNose suggests that M.P.'s failure to yell out when it would have been easy to draw attention to her plight negates her other attempts to escape the sexual contact, which RomanNose overcame. But we have already explained that "[a] child victim of sexual abuse may manifest a physical resistance that is lesser or different in kind than that of an adult rape victim." *Willie*, 253 F.3d at 1220. We thus reject RomanNose's insinuation that M.P. did not sufficiently resist and that RomanNose therefore did not have to use physical force to overcome the resistance.

11

RomanNose isolates each of these individual interactions to argue that he engaged only in unwanted touching, rather than assault by force. But this approach misapprehends our governing standard. We examine the evidence as a whole, rather than parsing out bits and pieces. *Scull*, 231 F.3d at 1282. This is essential to our inquiry—although both RomanNose's persistent contacts with M.P. and M.P.'s resistance were subtle, they were not insignificant. When viewed in their totality, RomanNose's actions provide sufficient evidence that he enacted a quantum of physical restraint on M.P. so significant that she could not escape the assault.

Third—and perhaps most telling that RomanNose's conduct satisfied the force requirement—M.P. made multiple efforts to escape the contact and physically could not. This separates this case from the Eighth Circuit's decision in *United States v. Fool Bear*, 903 F.3d 704 (8th Cir. 2018). In *Fool Bear*, the defendant grabbed his minor niece by the shoulders and led her to a bed, where he laid her down and "started taking advantage" of her while she "let it happen" because she was "getting tired of it." *Id.* at 711. The government argued that Fool Bear had used the requisite degree of force on his niece to constitute aggravated sexual abuse because the niece's testimony used words such as "grab," "push," and "pull," and because Fool Bear had previously physically abused his niece and so she may have subjectively understood him as a threat. *Id.* at 712. On appeal, the court rejected the government's argument. It concluded that the victim's language simply mirrored the language used in the prosecutor's questions and did not suggest actual force, and that the "mere fact of

12

past physical abuse" did not create an implied threat against the victim. *Id.* at 712–13.

RomanNose argues that this case is sufficiently analogous to *Fool Bear* to demand the same result. We disagree. This case is distinguishable from *Fool Bear* because (1) *Fool Bear* does not address disparities in size or coercive power, both of which were present here; (2) M.P. did not "let it happen," but, as previously explained, resisted and was restrained until RomanNose overcame her will; and (3) at trial, M.P.'s statements that indicated physical force—"jerked," "holding," "pushed"—never mirrored the language of the person asking her questions. Further, while the mirroring in *Fool Bear* "limit[ed] what reasonable inferences a jury might draw" from the victim's language, *id.* at 712, no such limit exists here. *Fool Bear* thus compels no conclusion in this case and does not affect our analysis.

RomanNose presents two final arguments to show the evidence was insufficient to support his conviction. First, he contends that the jury could not convict him unless the government proved he *knew* M.P. only submitted to the sexual act because he was using force. *See* Aplt. Br. at 11–12. And second, he claims that finding force in this case would collapse the distinction between sexual abuse of a minor, sexual abuse, and aggravated sexual abuse of a minor. Both arguments fail.

First, our Circuit has not decided whether the term "knowingly" modifies the statutory phrase "used force" and the term "caused." *See United States v. Condry*,

No. 22-5058, 2023 WL 3994381, at *3–4 (10th Cir. June 14, 2023) (unpublished).[5]

But doing so now would not change the outcome of this appeal. The jury could infer that, after the lollipop incident, RomanNose, a forty-year-old adult, would have known his sexually charged words and actions made M.P. uncomfortable. And because RomanNose knew M.P. had tried to push him off, knew she had tried to get away, and knew she was a child, the jury could reasonably infer RomanNose knew M.P. would not have submitted to the sexual act absent his use of force.[6] Likewise, a reasonable jury could infer that RomanNose knew he used force when he penetrated M.P. after she repeatedly pushed his hands away.

Second, finding that RomanNose used force in this case would not collapse the distinction between sexual abuse of a minor, sexual abuse, and aggravated sexual abuse of a minor. RomanNose argues that some power disparity and level of physical force will always be present when a child is sexually abused, and therefore we must employ a relatively high quantum-of-force requirement when determining the threshold for aggravated sexual abuse of a minor. But we have already dealt with this argument on numerous occasions, and our conclusion remains the same: "[N]ot every instance of sexual contact with a child under the age of twelve involves actual

---

[5] We may cite unpublished, nonprecedential opinions for their persuasive value. *See* Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[6] We want to make clear that M.P. was not required to physically resist RomanNose. The crux of a sexual assault conviction is the defendant's knowledge and actions, not what the victim did or did not do. We describe her actions here because they inform the jury's inferences about what RomanNose knew when he assaulted her—that is, that he knew she did not consent to the act.

physical force." *Reyes Pena*, 216 F.3d at 1210.  There is a significant difference between this case and one where a child factually consents to an act, but, because of her age, cannot give legal consent.  *See, e.g.*, *United States v. Has No Horse*, 11 F.3d 104, 105 (8th Cir. 1993) (noting the eleven-year-old victim "voluntarily" engaged in sexual intercourse with the defendant).  M.P. did not "voluntarily" allow RomanNose to penetrate her.  Nor did she not indicate in any way that she consented.  A jury could reasonably find that RomanNose knew she would not have submitted to the act but for his use of physical force.

Therefore, we affirm the aggravated sexual abuse of minor conviction.[7]

**b.**

Because we affirm RomanNose's aggravated sexual abuse of a minor conviction, we are faced with the issue of whether sentencing RomanNose for both aggravated sexual abuse of a minor and sexual abuse of a minor violated his rights under the Double Jeopardy Clause.  *See* U.S. Const. amend. V.  The government concedes that it does and that the violation constitutes plain error.

We agree.  The Double Jeopardy Clause protects against double punishment for the same offense.  While the same conduct may violate more than one statute, the state may not impose multiple punishments unless each offense requires proof of an element the other does not.  *See Blockburger v. United States*, 284 U.S. 299, 304

---

[7] RomanNose also argues that, under the rule of lenity, we should reverse his conviction if 18 U.S.C. § 2241(a)(1) is ambiguous.  Because we find § 2241(a)(1) unambiguous, the rule of lenity does not apply.

15

(1932). In other words (and with exceptions not relevant here), a defendant cannot be punished for both an offense and a lesser-included offense. We apply the *Blockburger* test to determine if, when "the same act or transaction constitutes a violation of two distinct statutory provisions," "there are two offenses or only one." *United States v. Benoit*, 713 F.3d 1, 12 (10th Cir. 2013) (quoting *Blockburger*, 284 U.S. at 304).

To prove a charge of sexual abuse of a minor under 18 U.S.C. § 2243(a), the government must show the defendant "knowingly engage[d] in a sexual act with a person who has attained the age of 12 years but has not attained the age of 16 years[] and is at least four years younger than the [defendant]." By contrast, to prove a charge of aggravated sexual abuse of a minor under 18 U.S.C. § 2241(c) when the minor is over the age of twelve, the government must prove the defendant "knowingly cause[d] another person to engage in a sexual act[] by using force against that other person" and the other person "has attained the age of 12 years but has not attained the age of 16 years (and is at least 4 years younger than the [defendant])." *Id.* § 2241(a)(1), (c). Aggravated sexual abuse of a minor requires an element which sexual abuse of a minor does not—the use of force. But there is no element of sexual abuse of a minor that is not also required for a conviction of aggravated sexual abuse of a minor. Therefore, sexual abuse of a minor is a lesser-included offense of aggravated sexual abuse of a minor, and the district court plainly erred by punishing RomanNose for both offenses. We remand this case to the district court with instructions to vacate one of his sentences.

16

**c.**

If the district court does not vacate RomanNose's sentence for aggravated sexual abuse of a minor, U.S.S.G. § 2A3.1 will apply. At his first sentencing, the district court plainly erred by applying a two-level enhancement under U.S.S.G. § 2A3.1(b)(4)(B). This enhancement does not apply if there is no finding of a serious bodily injury other than the sexual assault itself. *See* U.S.S.G. § 2A3.1(b)(4)(B) app. note 1. As the government concedes, there was no such finding.

RomanNose argues that, at resentencing, the district court should be limited to the record before it. The government should not have an opportunity to produce additional evidence of a serious bodily other than the sexual assault. We agree. Although "[a] remand for resentencing [] allows the district court to conduct de novo review," "we have discretion to order resentencing on the existing record" pursuant to the mandate rule. *United States v. Aragon*, 922 F.3d 1102, 1113 (10th Cir. 2019) (quoting *United States v. Forsythe*, 437 F.3d 960, 963 (10th Cir. 2005)). Whether we limit the district court's discretion depends on the circumstances of the case. In *Forsythe*, for example, we limited our remand to the existing record:

> Under well-established Tenth Circuit precedent, the government has the burden of proving sentence enhancements and increases. The government failed to meet its burden of proof on a clearly established element required for the enhancement, and we decline to give it a second bite at the apple. Although Defendant alerted the government to the deficiency in its evidence, the government did not seek to cure the deficiency. Our reversal and remand for resentencing here does not invite an open season for the government to make the record that it failed to make in the first instance.

437 F.3d at 963–64 (internal alterations omitted) (quoting *United States v. Campbell*, 372 F.3d 1179, 1184 (10th Cir. 2004)).

This case presents a similar situation. The application note clearly indicated the government needed to produce evidence of a serious bodily injury other than the sexual assault. Recognizing this, RomanNose timely objected, putting the government on notice of the deficiency in its evidence. The government did not seek to "cure the deficiency." *Id.* On remand, the government will be able to cite any evidence already in the record, including M.P.'s testimony about her pain and any victim impact statements. Beyond this evidence, the government does not get a "second bite at the apple" to "make a record it failed to make in the first instance." *Id.* (quoting *Campbell*, 372 F.3d at 1183).

**III.**

For the reasons stated above, we AFFIRM RomanNose's conviction for aggravated sexual abuse of a minor and REMAND for resentencing consistent with this opinion.

Entered for the Court

Allison H. Eid
Circuit Judge

18